**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**GOETZ D. VEHSE,**

**Plaintiff,**

**vs.** **Case No.: 8:16-cv-599-T-33JSS**

**LIBERTY MUTUAL FIRE INSURANCE COMPANY,** **DISPOSITIVE MOTION**

**Defendant.**
**_____________________________________/**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Defendant, Liberty Mutual Fire Insurance Company ("Liberty Mutual"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 3.01, moves this Court to enter final summary judgment in its favor and against Plaintiff, Goetz D. Vehse, as there is no genuine issue of material fact and Liberty Mutual is entitled to judgment as a matter of law.

## INTRODUCTION

This breach of contract action arises out of a claim for sinkhole damage Plaintiff made in 2010 under his Liberty Mutual homeowner's insurance policy. After Liberty Mutual confirmed the presence of sinkhole activity and indemnified Plaintiff for repairs in 2011, Plaintiff's coverage with Liberty Mutual ended in 2012. Three years later, Plaintiff notified Liberty Mutual that new damage had occurred in 2015. Liberty Mutual denied that claim because Liberty Mutual does not insure losses that occur outside its policy periods. Plaintiff then sued Liberty Mutual for breach of contract, characterizing his claim as a "failed repair." However, Liberty Mutual and Plaintiff did not contract for the repairs. Additionally, Plaintiff

has developed no credible evidence, through experts or otherwise, that links the damage he observed in 2015 to the repairs performed in 2011. Accordingly, Liberty Mutual is entitled to judgment as a matter of law.

## STATEMENT OF MATERIAL FACTS

1. Liberty Mutual issued Plaintiff homeowner's insurance policy number H32-251-404160-100 3 ("2010 Policy"), effective April 12, 2010, to April 12, 2011, for the property at 4620 Fort Shaw Drive in New Port Richey, Florida ("Property"). A copy of the 2010 Policy is attached as Exhibit 1.

2. The Policy states that Liberty Mutual will pay for necessary repairs in case of a sinkhole loss that occurs during the effective period:

> **SECTION I – PERILS INSURED AGAINST**
> The following perils are added:
> **Sinkhole Loss**
> **a.** Sinkhole Loss means structural damage to the building, including the foundation, caused by sinkhole activity. Contents coverage shall apply only if there is structural damage to the building caused by sinkhole activity..
> **(1)** We will pay to stabilize the land and building and repair the foundation in accordance with the recommendations of a professional engineer and in consultation with you as under 627.7073.
> **b.** Sinkhole Activity means settlement or systematic weakening of the earth supporting such property only when such settlement or systematic weakening results from movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

Exhibit 1, p. 31-32

> **SECTIONS I AND II – CONDITIONS**
> 1. Policy Period. This policy applies only to loss in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.

Exhibit 1, p. 21.

3. On July 20, 2010, a public adjuster, Jeff Pyatt of Five Star Claims Adjusting, reported a possible sinkhole claim on behalf of Plaintiff to Liberty Mutual. *See* Affidavit of Cerese Van Hooven, attached to this Motion as Exhibit 2, ¶ 5.

4. Liberty Mutual retained Rimkus Consulting Group, Inc., ("Rimkus") an independent engineering firm, to investigate Plaintiff's claim. Exhibit 2, ¶ 6.

5. In a Report of Findings – Vehse Residence Foundation Investigation, dated October 28, 2010, Rimkus concluded that sinkhole activity existed at the Property and recommended a repair protocol consisting of limited mobility displacement grouting, underpinning of the structure, and polyurethane injections. *See* 2010 Report, attached to this Motion as Exhibit 3, pp. 2-3.

6. Notably, the 2010 Report contains the following limitations:

> Please be aware that the grouting program is designed and intended to treat only for sinkhole activity. The grouting program is not intended to treat or remediate other detrimental soil conditions that may or may not exist at the site such as buried debris, organic material, expansive (shrink/swell) clays or improper foundation design problems. The homeowner should be aware that compaction grouting may induce additional settlements and additional cracking of the structure before deep soil conditions are stabilized.

Exhibit 3, p. 27.

> Please be aware that the underpinning program is designed and intended to treat for the differential movement of the building related to the combined effects of the buried debris and sinkhole related activity. The underpinning program is not intended for the treatment or remediation of other detrimental soil conditions that may or may not exist at the site, nor does it address improper foundation design problems.

Exhibit 3, p. 28-29.

> As previously mentioned in our report, it should also be noted that portions of the observed damage are due to normal settlement, material characteristics, deterioration due to age, etc., and are unrelated to sinkhole activity. As such, **it is unrealistic to expect that cracks and separations will never again form in the building after the sinkhole has been remediated**, regardless of what method of remediation is performed. However, this damage is typically minor and cosmetic in nature, with cracks less than 1/8 inch in width, and can be repaired with simple patching and painting as part of the routine maintenance of the structure.

Exhibit 3, p. 29 (emphasis added).

7. As a service to Plaintiff, Liberty Mutual helped facilitate repairs by identifying available contractors and obtaining bids for Plaintiff's selection. Exhibit 2, ¶ 7.

8. Liberty Mutual obtained bids from NEC Keystone, Inc.; Earth Tech, LLC; and L.R.E. Ground Services, Inc. Exhibit 2, ¶ 8.

9. On November 29, 2010, Plaintiff retained a company he located and selected on his own, RAB Foundation Repair LLC, to perform the underground repairs to his Property. Exhibit 2, p. 9. A copy of Plaintiff's executed contract with RAB is attached to this Motion as Exhibit 4.

10. Plaintiff's contract with RAB contained the following:

> OBJECTIVE
> RAB will provide sinkhole remediation and/or foundation repair services [hereinafter referred to as "The Work"] at the above-referenced property using the Injection/Pressure Pier and/or Compaction Grout System. No purpose, expressed or implied, other than to stabilize the soil, is intended.

Exhibit 4, p. 1.

11. RAB performed the repairs Rimkus had recommended between January and April 2011. Rimkus monitored the repairs and issued a Report of Findings – Vehse Residence Soils Improvement by Subsurface Grouting, Situational Underpinning and Polyurethane Injection on June 9, 2011. A copy of the 2011 Report is attached as Exhibit 5.

12. The 2011 Rimkus Report reaffirmed the repair recommendations of the 2010 Report and stated that RAB performed the subsurface grouting program, steel underpinning, and polyurethane injections in accordance with the recommendations. Exhibit 5, p. 4.

13. Rimkus' 2011 Report also states the following:

> This report was prepared for the exclusive use of Mr. and Mrs. Vehse and was not intended for any other purpose. Our report was based on the information available to us at this time and on conditions visibly evident and accessible. Please note that the site and structure conditions may change with the passage of time.

Exhibit 5, p. 1.

> It must be remembered that the subsurface grouting procedure is intended to treat the subsurface soils for only sinkhole activity. The grouting program is not intended to mitigate the effects of other subsurface conditions such as normal settlements of surface sands or the effects of clays that may expand and contract in response to seasonal moisture conditions.

Exhibit 5, p. 5.

> It must be remembered that underpinning only a portion of the foundation will not remedy problems or potential problems that may exist in other areas of the structure, and differential settlements of the structure are possible.

Exhibit 5, p. 6.

14. After these repairs, Plaintiff hired R.J. Simone Enterprises to perform cosmetic, or above-ground, repairs to the Property. *See* Transcript of Examination under Oath of Plaintiff, attached to this Motion as Exhibit 6, p. 26, ll. 12-25.

15. Liberty Mutual paid Plaintiff for the cosmetic repairs. Exhibit 2, ¶ 10.

16. During his examination under oath on July 24, 2015, Plaintiff testified that after R.J. Simone completed its work, all damage to his home had been repaired and no unrepaired damage remained. Exhibit 6, p. 27, l. 18 – p. 28, l. 16.

17. Liberty Mutual did not renew Plaintiff's homeowner's insurance coverage after July 2012, and Plaintiff procured homeowner's insurance from Citizens Property Insurance Corporation, without sinkhole coverage. Exhibit 6, p. 16, ll. 8-25.

18. In June 2015, Plaintiff notified Liberty Mutual of new damage. Exhibit 6, p. 30, l. 22 – p. 31, l. 6; *see also* Amended Complaint, Doc. 18, ¶ 10.

19. Plaintiff testified that no damage had occurred at the Property after the completion of repairs in 2011 until 2015. Exhibit 6, p. 29, l. 23 – p. 37, l. 9.

20. In other words, no damage occurred during the remainder of 2011, none during 2012, none during 2013, and none during 2014, a period of more than three years. Exhibit 6, p. 29, l. 23 – p. 37, l. 9.

21. Plaintiff also testified that the cracks at his home were new cracks, rather than the re-opening of damage that existed before the repairs. Exhibit 6, p. 37, ll. 6-9; p. 38, ll. 11-25.

22. On January 21, 2016, Plaintiff sued Liberty Mutual in a Florida state court; Liberty Mutual later removed the suit to this Court.

23. On May 13, 2016, Plaintiff filed an Amended Complaint, which remains the operative complaint. Doc. 18.

24. The Amended Complaint contains the following relevant allegations:

> 10. Thereafter in early 2015, the Plaintiff noticed that damage to the Property that was not repaired, had re-appeared, and was worsening. The recommended repairs for the Defendant had failed to remediate the sinkhole activity at the Property.

Doc. 18, ¶ 10.

25. The Amended Complaint contains two counts for breach of contract, both of which presume that the 2011 repairs are responsible for the damage that occurred in 2015. Doc. 18, ¶¶ 14-33.

26. On September 23, 2016, as part of its Rule 26 expert witness disclosures, Plaintiff disclosed a Report of Settlement Investigation prepared by engineer Sunil Gulati and dated January 11, 2016. A copy of the Gulati Report is attached as Exhibit 7.

27. Mr. Gulati's Report states that sinkhole activity caused the reported damage at Plaintiff's home. Exhibit 7, p. 3.

28. The Gulati Report contains the following opinions:

> It is my professional opinion that the initial sinkhole remediation plan was deficient to start with. …

Exhibit 7, p. 9.

> The subject structure was built in 2000, and the homeowner first noticed damage recently. The subject structure is still underlain by karst conditions as the sinkhole remediation program implemented by [Rimkus] has been deficient.

Exhibit 7, p. 10.

29. However, during his deposition on December 7, 2016, Mr. Gulati testified that he does not hold the opinion that Rimkus' remediation plan was deficient, directly contradicting his Report:

> Q All right. What [are] your opinions with regard to the Rimkus original report that you reviewed?
> A I don't have an issue with the report. The report accurately opined that sinkhole activity and sinkhole loss was present. And no issue there.
> Q What about the recommendations for remediation and stabilization?
> A I agree with them on that.

Transcript of Deposition, Sunil Gulati, attached to this Motion as Exhibit 8, p.9, ll. 2-9.

> Q … You seem to state that you didn't have an issue with the subsurface grouting recommended by Rimkus in the report; is that correct?
> A Yes. The specifications which they provided, I think they were good – good recommendations, but the issue is that those recommendations were not followed.

Exhibit 8, p. 12, l. 19 – p. 13, l. 1.

.

30. Mr. Gulati also testified that although he found sinkhole activity at Plaintiff's home, he could not determine when this activity started.

> Q SPT Boring No. 2, what -- does it – what does it tell you? It tells you that there is sinkhole activity present; is that correct?
> A Yes.
> Q Does it tell you when that sinkhole activity formed?
> A That sinkhole activity is there for a long, long time. Weight of hammer conditions for 30 inches, they do not develop overnight. That's something -- especially looking at where the house is located, Pasco County, backyard sinkholes. I think that sinkhole activity there for a long, long time. Hundreds of thousands of years.
> Q So by looking at the data in SPT Boring No. 2, you are able to opine how long that sinkhole activity has been present at the property?

A No. If you're asking me the exact timing, I don't know. I don't think anybody has done any testing to look at the timing issue.

Exhibit 8, p. 24, l. 24 – p. 25, l. 18.

Q We talked about the concept of dating sinkhole activity. Are you able -- as a geotechnical engineer, are you able to give an opinion on when sinkhole activity formed?
A If you're asking for exact date, no, I can't. But I can tell you it's there for a long time.
Q But you can't say if it was in this year or this year or --
A No, I can't. I don't believe anybody can do that.

Exhibit 8, p. 58, ll. 9-18.

31. In addition to Mr. Gulati, Plaintiff disclosed a professional geologist, James Funderburk, as an expert witness. Mr. Funderburk prepared a Peer Review and Evaluation – Vehse Property dated September 23, 2016. A copy of the Funderburk Report is attached as Exhibit 9.

32. During his deposition on November 29, 2016, Mr. Funderburk also testified that he was not able to date sinkhole activity or determine when it began. In fact, Mr. Funderburk testified that no one would be able to do so:

Q Are you able, from dropping the boring and 4 finding sinkhole activity in January of 2016, to determine when this sinkhole activity developed?
A Nobody knows when it started. The only thing you can do is make reasonable assumptions with known unknowns or known knowns.

Transcript of Deposition of James Funderburk, attached to this Motion as Exhibit 10, p. 66, ll. 3-8.

Q In terms of the Vehse property, are you able, as a geologist, to give an opinion on when sinkhole activity in Boring No. 2 developed?

A Absent other observations, no. I just told you nobody can without other types of bracketing information.

Exhibit 10, p. 70, ll. 3-8.

33. Liberty Mutual disclosed expert witness George C. Sinn, who prepared a report dated September 12, 2016, and whom Plaintiff deposed on November 21, 2016. A copy of the Sinn Report is attached to this Motion as Exhibit 11, and a copy of the transcript of his deposition is attached as Exhibit 12.

34. Like Mr. Gulati and Mr. Funderburk, Mr. Sinn testified during his deposition that it was impossible to determine when sinkhole activity began:

A … If you have an extended period of a history of no new damage and then all of a sudden something starts back, those soil borings cannot be backdated to a point in the past.

Exhibit 12, p. 30, ll. 17-20.

Q Okay. What about systematic weakening? Could you give -- say you're looking at an SPT boring and you see systematic weakening of the soil. Could you give a time frame of how long it took those soils to systematically weaken?
A Nobody can.

Exhibit 12, p. 35, l. 22 – p. 36, l. 2.

Q Okay. And I believe you stated earlier that no one can determine how long it takes soils to systematically weakening [*sic*]?
A Specifically, yes. You can't age it and say it took two weeks or ten days or a year and four months and two days and ten minutes, you know. You can't do that.

Exhibit 12, p. 37, ll. 3-8.

35. The Sinn Report similarly states:

> The boring data can only identify indicators of sinkhole activity in the present timeframe. The boring data, representing a slice in time, cannot determine when they began or how long they may have existed.

Exhibit11, p. 7.

## ARGUMENT AND MEMORANDUM OF LAW

Liberty Mutual is entitled to final summary judgment because there is no genuine dispute as to any material fact and Liberty Mutual is entitled to judgment as a matter of law. Liberty Mutual indemnified Plaintiff for a sinkhole loss in 2010-2011 and later ended its insurance relationship with Plaintiff. Four years after repairs and three years after his coverage ended, Plaintiff notified Liberty Mutual of new damage, discovered in 2015, at his Property. After Liberty Mutual denied coverage, Plaintiff sued for breach of contract, alleging that the 2011 repairs failed. However, Liberty Mutual did not perform or warranty the repairs, it only funded them pursuant to its Policy. In addition, Plaintiff was told it was unrealistic to expect that his Property would never develop another crack. Plaintiff continued to pay for sinkhole coverage after the repairs until his coverage with Liberty Mutual ended. Finally, every expert involved in this case has testified that it was impossible to determine how long soil conditions discovered at a certain point in time had existed. As these facts are undisputed, there is no basis for a breach of contract claim against Liberty Mutual, and Liberty Mutual is entitled to judgment as a matter of law.

### I. Summary Judgment Standard and Governing Law

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute that does not involve a material fact is not enough to

defeat a properly pled motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court that there are no genuine issues of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (*citing Celotex*, 477 U.S. at 324).

In case of a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed true, and all reasonable inferences must be drawn in the non-moving party's favor. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, summary judgment is not appropriate. *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is required. *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981).

Florida law governs this diversity action. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1020 (11th Cir. 2014).

## II. Plaintiff Cannot Meet the Burden of Proof in His Breach of Contract Action

Plaintiff has sued Liberty Mutual on two counts alleging that Liberty Mutual breached its insurance contract with Plaintiff. Doc. 18. However, Plaintiff cannot meet the burden of proof for a breach of contract action. The elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006); *United States ex rel. W.W. Gay Mech. Contr., Inc. v. Walbridge Aldinger Co.*, 543 F. App'x 937, 939 (11th Cir. 2013). Plaintiff's lawsuit fails to meet these elements because (A.) Plaintiff did not contract with Liberty Mutual for the allegedly failed repairs, (B.) there is no evidence that the 2011 repairs were performed deficiently, (C.) new cracking damage is not a breach of the Policy, and (D.) there is no evidence that links the 2011 repairs to the damage observed in 2015 or purported sinkhole activity observed in 2016.

### A. Plaintiff and Liberty Mutual did not contract for the repairs

Liberty Mutual does not dispute that a valid contract existed between it and Plaintiff – the Policy. *See* Exhibit 1. However, the Policy is an indemnity contract, not a repair contract, as the Policy states:

> (1) **We will pay** to stabilize the land and building and repair the foundation in accordance with the recommendations of a professional engineer and in consultation with you as under 627.7073.

Exhibit 1, p. 32 (emphasis added).

Furthermore, the Policy provides this coverage only for losses that occur during its effective period:

SECTIONS I AND II – CONDITIONS

1. Policy Period. This policy applies only to loss in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.

Exhibit 1, p. 21.

Pursuant to the Policy, Liberty Mutual was responsible to pay for repairs but not for their performance of the repairs. In other words, the Policy is an indemnity contract. *See, e.g.*, *Castleberry v. Goldome Credit Corp.*, 418 F.3d 1267, 1272 (11th Cir. 2005) ("[I]nsurance agreements are indemnity agreements."); *Brock v. Hardie*, 154 So. 690, 697 (1934) (Insurance "is a mere contract of indemnity against contingent loss."). There is no dispute that Liberty Mutual paid for the 2011 repairs.

Plaintiff contracted with directly with RAB for the performance of the repairs, and Liberty Mutual was not a party to this contract. Exhibit 4. In fact, Liberty Mutual had no relationship with RAB. Recall that RAB was not even among the contractors from whom Liberty Mutual had solicited bids as a courtesy to Plaintiff. Exhibit 2, ¶¶ 7-8. Instead, Plaintiff took it upon himself to find a contractor and select RAB. Exhibit 2, ¶ 9.

Accordingly, there is no contract between Plaintiff and Liberty Mutual for the performance of the 2011 repairs, and Plaintiff cannot meet the first element of a breach of contract action. Plaintiff should bring his breach of contract action against his contractor.

**B. No evidence of deficiently performed repairs exists**

As to element number 2, the breach of the contract, Plaintiff relies on the Report and deposition testimony of his expert witness Mr. Gulati, who has opined that the 2011 repairs

were appropriately designed by Rimkus but performed deficiently by RAB. Plaintiff's reliance on Mr. Gulati is misplaced.

First, Liberty Mutual is moving separately to strike Mr. Gulati's opinions, as they do not meet the threshold of admissibility for this Court. Specifically, the opinions fail the reliability prong of the analysis set forth by the Eleventh Circuit in *Rink v. Cheminova,* 400 F. 3d 1286, 1292 (11th Cir.). Without Mr. Gulati's opinion, Plaintiff has no evidence whatsoever regarding the sufficiency or deficiency of the 2011 repairs. Without such evidence, Plaintiff cannot prove the element of breach.

Second, Mr. Gulati's approval of Rimkus' testing and recommendations shows that the repairs cannot have failed. Rimkus, in 2010, identified sinkhole activity near the southwest corner of the Property. Exhibit 3. Rimkus designed its repair recommendations to address this sinkhole activity. Mr. Gulati himself testified that Rimkus' recommendations were appropriate. Exhibit 8, p.9, ll. 2-9; p. 12, l. 19 – p. 13, l. 1. In other words, Rimkus recommended repairs for sinkhole conditions that existed in 2010, and Plaintiff's expert testified that the recommendations were correct. Mr. Gulati conducted testing and reported evidence of sinkhole activity in a different area of the Property, on the eastern side of the Property in January 2016, more than five years after Rimkus' testing. Rimkus' repair recommendations were not and could not have been designed to address the 2016 sinkhole activity, nor could they have failed to do so.

Third, Mr. Gulati – Plaintiff's own expert – testified that Rimkus' repair recommendations were appropriate, Rimkus certified that RAB performed the recommended repairs "in substantial accordance with our recommendations [and] with local industry

practices", and Plaintiff himself testified that RAB performed repairs to his full satisfaction. Exhibit 8, p.9, ll. 2-9; p. 12, l. 19 – p. 13, l. 1; Exhibit 5, p. 4; Exhibit 6, p. 39, l. 25 – p. 40, l. 2. A reasonable fact finder can draw only one inference from these facts: that RAB carried out Rimkus' recommendations sufficiently.

In sum, the opinion of Mr. Gulati that the 2011 repairs were implemented deficiently is inadmissible, and his own testimony shows that the repairs could not have failed. On the other hand, the repairs were certified by Rimkus, and Plaintiff testified that RAB performed repairs to his satisfaction. Accordingly, Plaintiff has no evidence that the 2011 repairs were improperly implemented. Accordingly, Plaintiff cannot establish the second element of his breach of contract action, that a breach occurred.

**C. New cracking damage at Plaintiff's Property is not a breach of the Policy**

Plaintiff's lawsuit is premised on an expectation that the 2011 repairs would forever prevent cracking damage at Plaintiff's property; however, neither Rimkus, nor RAB, nor Liberty Mutual made such a promise to Plaintiff. The 2011 repairs were only designed to – and could only – repair conditions that existed at the time and that Rimkus identified during its investigation in 2010. Liberty Mutual's promise to Plaintiff under the Policy was to pay for repairs of sinkhole losses that occur during the Policy period. This is precisely what Liberty Mutual did. The 2011 repairs could not eliminate the possibility of future sinkhole activity, nor was Plaintiff told that they would. The fact that Plaintiff understood and accepted this reality is illustrated by the fact that Plaintiff continued to purchase sinkhole coverage from Liberty Mutual after the repairs. *See, e.g.*, 2011/2012 Policy, attached to this Motion as Exhibit 13, p. 10. Plaintiff's lawsuit suggests, however, that Liberty Mutual

promised that it would forever indemnify Plaintiff for all future sinkhole activity, regardless of whether it still provided coverage.

In fact, Plaintiff was warned that it would be "unrealistic to expect that cracks and separations will never again form in the building." Exhibit 3, p. 30. Rimkus' post-remediation 2011 Report contained similar cautionary language: For example, the Report stated that "the site and structure conditions may change with the passage of time." Exhibit 5, p. 1. Furthermore, Plaintiff's contract with RAB states that RAB's work was intended only to "stabilize the soil." Exhibit 4, p. 1. Therefore, Plaintiff was alerted to the fact that the 2011 repairs would not necessarily prevent all future cracking damage to his Property. The assertion Plaintiff makes now, years after the repairs, therefore, is based on a contractual promise no one ever gave Plaintiff. Plaintiff's position is disingenuous because if Plaintiff had believed or expected that the 2011 repairs could completely eliminate an insured peril, he would not have continued to pay Liberty Mutual for sinkhole coverage. Exhibit 13, p. 10.

The absence of a promise that no cracking damage would ever again occur at Plaintiff's Property is important because Liberty Mutual's Policy insures only losses that occur during the Policy's effective period. Exhibit 1, p. 21. Liberty Mutual provided coverage and indemnified Plaintiff for the repairs that addressed the then-existing conditions and damage to the Property. Nothing in the Policy indicates that Liberty Mutual would warranty these repairs. Liberty Mutual's coverage for Plaintiff ended in July 2012. Exhibit 6, p. 16, ll. 8-25. The new damage Plaintiff reported in 2015 falls outside Liberty Mutual's coverage period by several years; therefore, the Policy does not provide coverage for this damage. It follows that Liberty Mutual did not breach the Policy.

**D. No evidence links the 2011 repairs to the 2015 damage**

Even if Mr. Gulati's opinion regarding the sufficiency of the repairs in 2011 were admissible, Plaintiff still could not show that the damage he first observed in 2015 was caused by the allegedly deficient repairs. Breach and damage are not independent concepts in a breach of contract analysis; they must be connected in that the breach must have caused the damage. *Rollins*, 951 So. 2d at 876. Here, at best, Plaintiff's evidence indicates three separate circumstances: (1) that the Property suffered damage in 2015; (2) that sinkhole activity existed at the Property in January 2016 (when Mr. Gulati conducted testing); and (3) that the 2011 repairs were deficient. However, nothing links the 2015 damage and 2016 sinkhole activity to the 2011 repairs, *i.e.* nothing shows that the alleged breached caused the damage.

The 2011 repairs were recommended by Rimkus. According to Mr. Gulati himself, the recommendations were appropriate. Exhibit 8, p.9, ll. 2-9; p. 12, l. 19 – p. 13, l. 1. When the subsurface repairs were completed in April 2011, Plaintiff hired R.J. Simone Enterprises to repair all above-ground damage. Exhibit 6, p. 27, l. 1 – p. 28, l. 16. By September 2011, no unrepaired damage remained. Exhibit 6, p. 28, l. 17 – p. 29, l. 1. Had cracking damage simply continued after the 2011 repairs, one might easily accept that the repairs were insufficient. *See* Exhibit 12, p. 29, l. 24 – p. 31, l. 4. However, according to Plaintiff himself, no damage occurred during the remainder of 2011, none during 2012, none during 2013, and none during 2014, a period of at least 39 months. Exhibit 6, p. 29, l. 23 – p. 37, l. 9.

Of Mr. Gulati's two Standard Penetration Test borings, only one, conducted on the eastern side of the Property, found conditions that may suggest sinkhole activity. According to Liberty Mutual's expert, Mr. Sinn, the conditions found in this boring indicate either a

"remnant weak zone left outside the immediate grout curtain" or "new sinkhole activity." Exhibit 11, p. 7. Mr. Sinn, Mr. Gulati, and Plaintiff's second expert, Mr. Funderburk all testified that they could not determine how long the conditions Mr. Gulati found in his boring had existed.

Mr. Sinn testified:

> A … If you have an extended period of a history of no new damage and then all of a sudden something starts back, those soil borings cannot be backdated to a point in the past.

Exhibit 12, p. 30, ll. 17-20.

> Q Okay. What about systematic weakening? Could you give -- say you're looking at an SPT boring and you see systematic weakening of the soil. Could you give a time frame of how long it took those soils to systematically weaken?
> A Nobody can.

Exhibit 12, p. 35, l. 22 – p. 36, l. 2.

> Q Okay. And I believe you stated earlier that no one can determine how long it takes soils to systematically weakening [*sic*]?
> A Specifically, yes. You can't age it and say it took two weeks or ten days or a year and four months and two days and ten minutes, you know. You can't do that.

Exhibit 12, p. 37, ll. 3-8.

Plaintiff's expert, Mr. Gulati, testified as follows:

> Q SPT Boring No. 2, what -- does it – what does it tell you? It tells you that there is sinkhole activity present; is that correct?
> A Yes.
> Q Does it tell you when that sinkhole activity formed?
> A That sinkhole activity is there for a long, long time. Weight of hammer conditions for 30 inches, they do not

develop overnight. That's something -- especially looking at where the house is located, Pasco County, backyard sinkholes. I think that sinkhole activity there for a long, long time. Hundreds of thousands of years.

Q So by looking at the data in SPT Boring No. 2, you are able to opine how long that sinkhole activity has been present at the property?

A No. If you're asking me the exact timing, I don't know. I don't think anybody has done any testing to look at the timing issue.

Exhibit 8, p. 24, l. 24 – p. 25, l. 18.

Q We talked about the concept of dating sinkhole activity. Are you able -- as a geotechnical engineer, are you able to give an opinion on when sinkhole activity formed?

A If you're asking for exact date, no, I can't. But I can tell you it's there for a long time.

Q But you can't say if it was in this year or this year or --

A No, I can't. I don't believe anybody can do that.

Exhibit 8, p. 58, ll. 9-18.

Finally, plaintiff's expert Mr. Funderburk testified as follows:

Q Are you able, from dropping the boring and 4 finding sinkhole activity in January of 2016, to determine when this sinkhole activity developed?

A Nobody knows when it started. The only thing you can do is make reasonable assumptions with known unknowns or known knowns.

Exhibit 10, p. 66, ll. 3-8.

Q In terms of the Vehse property, are you able, as a geologist, to give an opinion on when sinkhole activity in Boring No. 2 developed?

A Absent other observations, no. I just told you nobody can without other types of bracketing information.

Exhibit 10, p. 70, ll. 3-8.

In short, all three experts agree that it was not possible to determine how long the sinkhole activity Mr. Gulati claims to have found in 2016 had existed. Per Mr. Gulati's own testimony, he does not know, nor can he determine, when the condition he observed in his boring developed. This means that Mr. Gulati cannot rule out the possibility that the purported sinkhole activity developed at any point after the 2011 repairs, making it *new* sinkhole activity that could not have been repaired before it developed. The absence of any damage at Plaintiff's Property for more than three years supports this conclusion.

During this deposition, Mr. Gulati testified that the fact that he found certain soil conditions meant that the 2011 repairs were performed deficiently; however, Mr. Gulati also admitted that he could not testify as the age of the soil conditions. If Mr. Gulati cannot determine how old the purported sinkhole condition he found is, then Mr. Gulati cannot determine whether the purported sinkhole condition is related to the 2011 repairs. Without this connection, Plaintiff cannot prove that the 2011 repairs caused the damage he observed at the Property in 2015.

## CONCLUSION

There are no disputed facts that affect the outcome of this Motion. Liberty Mutual indemnified Plaintiff for a sinkhole loss in 2011. No one promised Plaintiff that the repairs would eliminate the possibility of future sinkhole losses; in fact, Plaintiff was told the opposite. Plaintiff demonstrated that he understood this by continuing to contract for sinkhole coverage with Liberty Mutual. Years after the repairs and after his coverage with Liberty Mutual ended, Plaintiff asked Liberty Mutual, rather than his then-insurer, to cover another sinkhole loss. When Liberty Mutual declined, Plaintiff sued. Plaintiff's position that Liberty

Mutual breached a contract because the 2011 repairs failed with him is untenable because Liberty Mutual did not contract for the repairs, no one promised Plaintiff that the repairs would eliminate future sinkhole activity, and nothing links soil conditions discovered in 2016 to repairs performed in 2011.

It is important to point out the motive for alleging, essentially, that 2011 repairs were deficient but that the remaining sinkhole activity somehow did not cause damage for over three years: Plaintiff has to make this claim because he neglected to purchase sinkhole coverage from the carrier that insured him in 2015, even though he had been put on notice that it was "unrealistic to expect that cracks and separations will never again form."

In light of the foregoing, there is no genuine dispute as to any material fact and Liberty Mutual is entitled to judgment as a matter of law.

Accordingly, Liberty Mutual respectfully moves this Court to grant final summary judgment in its favor and against Plaintiff.

Respectfully submitted

*/s/ Burks A. Smith, III, Esquire*
BURKS A. SMITH, III, ESQUIRE
Fla. Bar No. 13977
ALEXANDER ZESCH, ESQUIRE
Fla. Bar No. 106817
Traub Lieberman Straus & Shrewsberry LLP
Post Office Box 3942
St. Petersburg, Florida 33731
(727) 898-8100
(727) 895-4838 - fax
*Primary e-service:*
jkinchen@traublieberman.com
*Secondary e-service:*
flpleadings@traublieberman.com
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished via electronic mail to: A. Lee Smith, Smith, Kling & Thompson, P.A., 4725 N. Lois Avenue, Tampa, Florida 33614 at mrivera@smithkling.com; this 14th day of December, 2016.

*/s/ Burks A. Smith, III, Esquire*
BURKS A. SMITH, III, ESQUIRE